**A. Edward CHRONISTER, individually and trading and doing business as Mid-Atlantic Super Ice, Mid-Atlantic Wholesale, and Delaware Valley Slush, Plaintiff,**

**v.**

**ATLANTIC RICHFIELD COMPANY, Prestige Stations, Inc., William Robustelli, and Gary L. Bair, Defendants.**

Civ. A. No. 84–0809.

United States District Court, M.D. Pennsylvania.

Feb. 27, 1987.

Valerie A. Potteiger, Purcell, Nissley, Krug & Haller, Harrisburg, Pa., and Joseph F. Roda, Lancaster, Pa., for plaintiff.

Obermayer, Rebmann, Maxwell & Hipple, Frank B. Baldwin, Gary L. Bragg, Parry Warner and Philip M. Colicchio, Philadelphia, Pa., for William Robustelli.

David Lehman, Harrisburg, Pa., for defendants Prestige Stations and Atlantic Richfield.

Daniel J. Beggy, Mansmann, Beggy & Campbell, Pittsburgh, Pa., for Controlled Food Systems.

## MEMORANDUM

CALDWELL, District Judge.

### Introduction

Plaintiff, A. Edward Chronister initiated this action alleging violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (b), (c) and (d). The complaint also sets forth various claims under state law. Plaintiff's claims are based upon his contention that defendants, Atlantic Richfield Company ("ARCO"), Prestige Stations, Inc. ("PSI"), and William Robustelli, conspired with Gary Bair[1] for the purpose of driving plaintiff out of business and eliminating him as a competitor with Bair in the market for distribution of certain products to AM/PM MiniMarkets. All defendants, Robustelli, ARCO and PSI, have moved for summary judgment pursuant to Fed.R. Civ.P. 56. For the reasons which follow, we will grant their motions.

### Background

Based upon the pleadings, affidavits and depositions, the following is the background of this litigation. In 1981 and 1982, ARCO was the franchisor of conventional service stations and AM/PM MiniMarkets throughout the United States. PSI was and is a wholly-owned subsidiary of ARCO which acted as a franchisee owning and operating AM/PM's. In addition to the PSI owned franchises, ARCO franchised numerous AM/PM's to independent dealers. Defendant, Robustelli was and is an employee of ARCO, serving as a district manager for service stations in the Reading/Lancaster district.

In 1981, plaintiff formed Mid-Atlantic Super Ice and its successor in name, Mid-Atlantic Wholesale, which distributed cups, popcorn, hot chocolate, coffee and ice slush

---

1. Defendant, Gary Bair was dismissed as a defendant in this action after he filed a petition for bankruptcy. *See* order of January 8, 1985.

to certain AM/PM franchisees. Mid-Atlantic was managed by plaintiff and Gary Bair, who was employed as a consultant to Mid-Atlantic. In addition to his position with Mid-Atlantic, Bair was also employed by South Jersey Slush Puppie, Inc., a New Jersey corporation trading under the name of Delaware Valley Slush. Upon Bair's recommendation, plaintiff purchased Delaware Valley Slush in April, 1982 and retained Bair as a salesman. Bair and plaintiff subsequently entered into an agreement under which Bair was to become an equal partner in plaintiff's business upon satisfaction of two conditions. First, it had to be determined by plaintiff that Delaware Valley Slush possessed the assets and revenues represented to him by Bair. Second, plaintiff had to pay off the notes due on the purchase of Delaware Valley Slush.

Beginning in June, 1982, a dispute between Bair and plaintiff arose concerning Bair's ownership interest in Mid-Atlantic Wholesale. Several meetings involving plaintiff, Bair and Robustelli, who was a friend of Bair, were held for the purpose of resolving this dispute. Despite the parties' efforts to come to an agreement, none was reached. Negotiations were hampered by Bair's removal of the company records and his refusal to return them. The positions of the parties hardened and plaintiff alleges that on June 14, 1982 Robustelli demanded that he make Bair a partner, threatening him with the loss of his business. It is further alleged that Robustelli and Bair delivered an ultimatum to plaintiff that Bair was to work for Mid-Atlantic for $525/week until the notes were paid off and that he was then to receive a 50% interest in Mid-Atlantic for $1. Plaintiff, however, refused to accept these terms and Bair departed from Mid-Atlantic, taking with him a majority of plaintiff's employees. Plaintiff alleges at this point Robustelli began to prematurely demand payment for oil which he bought from Robustelli on credit in April, 1982. This dispute continued for sometime and plaintiff claims

that he received numerous visits and telephone calls from Robustelli and Larry Cramer, an ARCO salesman, demanding payment for the oil or its return.[2]

Plaintiff resisted payment of the charges for oil on the grounds that he was owed large sums from PSI. He informed Robustelli of this situation, and pursuant to Robustelli's request, an audit of Mid-Atlantic's account was performed and PSI made additional payments to plaintiff. It was also discovered at this time that Bair had misappropriated PSI checks payable to Mid-Atlantic for approximately $12,000. As a consequence, PSI stopped payment on these checks and issued replacement checks.

In addition, ARCO was demanding payment in the amount of $18,000 for certain promotional glasses which had been ordered by Mid-Atlantic. Plaintiff refused to pay these charges, asserting that the glasses were ordered by Bair without his authorization or knowledge. ARCO, however, continued to demand payment and requested that PSI hold all checks payable to Mid-Atlantic until the account was settled. Despite ARCO's request, PSI's records indicate that no checks were ever withheld. In fact, a final payment of $5,920.89 was made to plaintiff in February, 1983.

Plaintiff's business problems were compounded when Bair entered into competition with him in July, 1982. Operating under the name of Super Ice Distributors, Bair contacted ARCO in an attempt to become a recommended AM/PM supplier, but was informed of ARCO's allegiance to Mid-Atlantic. Accordingly, neither ARCO nor PSI, promoted, assisted or were associated with Bair's business.

By the end of July, these circumstances had practically put plaintiff out of business. He suffered from severe cash flow problems which in turn left him unable to pay suppliers and obtain the stock needed in his business. As a result, he began to

**2.** Defendants strongly contest plaintiff's version of the events. This dispute over the facts, however, does not preclude us from entering summary judgment because for the purposes of the pending motions we accept plaintiff's account as undisputed.

lose his accounts with the AM/PM stores. Eventually, plaintiff was forced to cease doing business sometime in the summer of 1982. He attributes his inability to remain in business to the following factors: (1) Bair's removal of the company's records in June; (2) Bair's abrupt departure on June 14, taking 75% of the company's employees; (3) the constant and demoralizing telephone calls which Mid-Atlantic's remaining employees began receiving after June 14 from ARCO representatives demanding to know Mid-Atlantic's status; (4) the unannounced and disruptive "visits" after June 14 by the Bairs, Robustelli, Cramer and the unidentified individuals accompanying them; (5) the constant demands by ARCO for payment of Mid-Atlantic's account; (6) the demands of other suppliers, which could not be paid because of a cash shortfall, and the litigation which some of said suppliers filed. (Verification A. Edward Chronister at ¶ 41).

*Discussion*

*Summary Judgment Standard*

We must evaluate defendants' motion for summary judgment under the following, well established standard:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and must resolve all reasonable doubts as to the existence of a genuine issue of material fact against the movant.

*Hersh v. Allen Products Company, Inc.*, 789 F.2d 230, 232 (3d Cir.1986).

*Antitrust Claims*

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. This section has been interpreted to proscribe only those contracts or combinations that "unreasonably" restrain competition. *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Antitrust claims are generally analyzed under either a rule of reason analysis or the *per se* approach. Under the former, a plaintiff must demonstrate an anticompetitive effect in the relevant product and geographic markets. *Mid-South Grizzlies v. National Football League*, 720 F.2d 772 (3d Cir. 1983); *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413, *reh'g denied*, 438 U.S. 908, 98 S.Ct. 3128, 57 L.Ed.2d 1150 (1978). Under the *per se* approach, certain commercial "practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. at 518, 2 L.Ed.2d at 549. Such *per se* illegal activities include group boycotts, price fixing, resale price maintenance, tying arrangements and certain types of reciprocal dealing. *Malley-Duff & Associates v. Crown Life Ins. Co.*, 734 F.2d 133, 140 (3d Cir. 1984) (citing *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979)). In the case at bar, plaintiff contends that a violation of the antitrust laws can be found under either theory.

*Per se Approach*

Applying the *per se* doctrine, plaintiff argues that the conduct of defendants, ARCO and PSI should be deemed an unreasonable restraint on trade. In this regard, he contends that the agreement between ARCO and PSI to withhold payments that were due him constituted an unlawful group boycott. Defendants, of course, dispute plaintiff's contention, asserting that the alleged conspiracy between ARCO and PSI cannot support an antitrust claim be-

cause a wholly owned subsidiary is incapable of conspiring or combining with its parent.

"[A] concerted activity constitutes a 'group boycott' and is considered *per se* 'in restraint of trade' when 'there [is] a purpose either to exclude a person from the market, or to accomplish some other anticompetitive objective, or both.'" *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1318 (3d Cir.1975). However, "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitior...." *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. ——, ——, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445, 456–67 (1986) (emphasis added).

Plaintiff's contention that defendants' conduct should be classified as a *per se* restraint on trade fails for two reasons. First, defendants' conduct does not fall within the definition of a group boycott. As explained above, a group boycott arises when one competitor attempts to exclude another competitor from the market place. However, in the present case, ARCO, PSI, and plaintiff were not competitors and there is no evidence that ARCO and PSI sought to affect competition among the AM/PM distributors. Thus, plaintiff's claim that defendants' action constituted a group boycott is without merit. *See Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 670 F.2d 421 (3d Cir.1982). Second, the alleged agreement between ARCO and PSI cannot support an antitrust claim. The United States Supreme Court in *Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) held that the coordinated behavior of a parent and its wholly owned subsidiary falls outside the reach of § 1. Here, it is undisputed that PSI is a wholly owned subsidiary of ARCO. Therefore, absent concerted action on the part of ARCO and PSI within the meaning of § 1, their actions are more accurately characterized as unilateral activity which does not implicate the goals of the antitrust laws. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, 783 (1984) ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whoever it likes, as long as it does so independently.") [3]

### *Rule of Reason Approach*

Having rejected plaintiff's *per se* theory, we now turn to the rule of reason analysis. Under this approach, the alleged unlawful conduct concerns plaintiff's assertion that defendant Robustelli entered into a conspiracy with Bair in the summer of 1982 which had as its purpose: the elimination of plaintiff as a competitor of Bair.[4] Defendants maintains plaintiff cannot establish a violation under the rule of reason approach because (1) there is no evidence which demonstrates the existence of an unlawful conspiracy between Robustelli and Bair [5] and (2) because there is no evidence which indicates that defendants' conduct had an anticompetitive effect.

In order to succeed under the rule of reason analysis, a plaintiff must establish the following:

---

**3.** Plaintiff asserts that a conspiracy proscribed by § 1 would exist if ARCO and PSI conspired with Bair. While this may be true, we find that plaintiff has failed to present evidence which tends to exclude the possibility that the alleged conspirators acted independently. *See Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corp.*, 475 U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To the contrary, the record when viewed as a whole, supports the contention of ARCO and PSI that they did not conspire with Bair.

**4.** Liability is asserted against ARCO under the doctrine of *respondeat superior*.

**5.** Although the evidence supporting the existence of a conspiracy between Robustelli and Bair is weak, we believe that there is enough evidence to create an issue of material fact concerning this issue.

(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Mid-South Grizzlies, supra* at 783.

Defendants argue that summary judgment should be granted in their favor because plaintiff has failed to introduce evidence demonstrating that defendants' conduct had an anticompetitive effect. Plaintiff, on the other hand, asserts that regardless of the effect, defendants' conduct violates the antitrust laws if it was designed to drive him out of business. In other words, plaintiff contends that he may succeed by showing that defendants' conspiracy had either an unlawful purpose or an unreasonable effect.

Contrary to plaintiff's contention, "Sherman Act liability requires an injury to competition." *Mid-South Grizzlies, supra* at 785. In *Franklin Music Co. v. American Broadcasting Companies, Inc.*, 616 F.2d 528 (3d Cir.1979) the plaintiff brought, *inter alia*, an antitrust claim alleging that defendants entered into a conspiracy for the purpose of injuring plaintiff's business. The district court directed a verdict in favor of defendants on the antitrust claim, stating that the failure of plaintiff to introduce evidence of an anticompetitive effect was fatal to its claim. On appeal, the court concluded that the directed verdict was proper.

If, under the governing law, a showing of anticompetitive effect beyond merely being driven out of business is required, then the ruling of the district court is undoubtedly correct. Under the law of this circuit, a civil conspiracy for a purpose unlawful under Pennsylvania law must be accompanied by proof of an effect upon competition in a defined market in order to make out a prima facie violation of section 1 of the Sherman Act.

That being so, we have examined the record to determine if it contains the quantum of proof required by such cases as *Evans v. S.S. Kresge Co.*, 544 F.2d 1184, 1194–96 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) and *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246–47 (3d Cir.1975). We hold that it does not. While I remain personally dubious about the legal proposition that a conspiracy, unlawful under state law, to injure a business in commerce so as to depress its price for purposes of an acquisition, is not a Sherman Act violation absent proof of injury to competition in the line of commerce in which the victim is engaged, the law of this circuit is clear.

*Id.* at 541–42 (footnotes omitted).

Thus, under the law of the Third Circuit, a plaintiff must demonstrate an anticompetitive effect beyond being forced out of business. The majority of circuits have reached the same conclusion. *See, e.g., Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984) (Posner J.); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414 (11th Cir.1984); *Robert's Waikiki U–Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403 (9th Cir. 1984); *El Cid, LTD. v. New Jersey Zinc Co.*, 551 F.Supp. 626 (S.D.N.Y.1982). Moreover, we believe this approach is the better reasoned one as it is more consistent with the purpose of the Sherman Antitrust Act, which is to protect competition not competitors. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

In the instant case, the record is devoid of any evidence which demonstrates that defendants' action had an anticompetitive effect on the relevant markets. There is absolutely no proof that prices or competition were altered by plaintiff's departure from the AM/PM distribution business. To the contrary, the uncontested evidence before us indicates that significant competition remained among the existing distributors. (Affidavit of Wayne Hummel at ¶ 8;

Affidavit of Robert Templeton at ¶ 9). Plaintiff's verification, to the extent it contains admissible evidence,[6] is not sufficient to create an issue of material fact concerning this issue. In his verification, plaintiff does not provide factual information concerning prices or the number of competitors, but only concludes that "the competitive situation for the AM/PM market in the area which I served was significantly altered." (Verification of A. Edward Chronister at ¶ 43). Such a self-serving statement, however, cannot be relied upon to prove an injury to competition. Thus, since plaintiff has failed to establish that the relevant markets were adversely effected by defendants' conduct, we will grant summary judgment in favor of defendants on plaintiff's antitrust claim. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## RICO

In addition to the antitrust claim, plaintiff alleges that defendants violated §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).[7] Defendants contend that they are entitled to summary judgment because the complaint does not properly allege a pattern of racketeering activity. More specifically, defendants argue that a pattern of racketeering activity requires proof of at least two separate criminal episodes and hence plaintiff's complaint is deficient because defendants' alleged acts were part of a single transaction or scheme.

A pattern of racketeering activity is defined by RICO as follows:

"[P]attern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5).

Further defining the pattern requirement, the Supreme Court in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) stated that:

The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." (citation omitted).

*Id.* at —— n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358 n. 14.

The *Sedima* definition has created some confusion and has led courts to take various approaches to the pattern requirement. Some courts have taken the position that a RICO violation requires at least two separate criminal schemes or episodes. *See e.g., Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1984); *Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Insurance Co.,* 641 F.Supp. 297 (E.D.Pa. 1986); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (D.C. Ill.1985). Representative of this approach is the opinion in *Superior Oil, supra,* which stated that:

It is difficult to see how the threat of continuing activity stressed in the Senate

---

**6.** We have doubts concerning the admissibility of plaintiff's verification. The verification states that it is true and correct to the best of plaintiff's personal knowledge, information and belief. Such an affirmation appears to be inconsistent with Fed.R.Civ.P. 56(e) which provides that opposing affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See*

*Lowe v. Philadelphia Newspapers, Inc.,* 594 F.Supp. 123, 126 (E.D.Pa.1984) ("Affidavits prefaced upon 'belief' or 'information and belief' must be stricken.")

**7.** The complaint originally set forth claims under §§ 1962(a), (b), (c) and (d). Plaintiff, however, has opted not to pursue his claims under §§ 1962(a) and (b).

Report could be established by a single criminal episode. * * * It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity."

*Id.* at 257.

Other courts have ruled that two related acts which arise out of the same transaction may constitute a pattern of racketeering.[8] *See, e.g., U.S. v. Ianniello,* 808 F.2d 184 (2nd Cir.1986); *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986); *Penturelli v. Spector Cohen Gadon & Rosen,* 640 F.Supp. 868 (E.D.Pa.1986). In *Morgan,* the court rejected the requirement of two separate criminal schemes on the following rationale:

> The acts must demonstrate both a continuity and a relationship in order to constitute a pattern of racketeering activity. However, the proposition that the predicate acts must always occur as part of separate schemes in order to satisfy the continuity aspect of the pattern requirement focuses excessively on continuity, and therefore cannot be accepted as a general rule. Otherwise defendants who commit a large and ongoing scheme, albeit a single scheme, would automatically escape RICO liability for their acts, an untenable result.

*Id.* at 975.

■ For purposes of this motion we need not resolve this conflict because we find that defendants' acts do not constitute a pattern of racketeering. As noted above, the pattern requirement contemplates both

continuity and a relationship among the predicate acts. *Sedima,* 473 U.S. at —— n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 538 n. 14. Interpretating the continuity element, we believe that it is essential for plaintiff to show that the predicate acts occurred over a substantial period of time. *See United States v. Freshie Co.,* 639 F.Supp. 442 (E.D.Pa.1986). In the case at bar, plaintiff alleges that Robustelli and Bair entered into a conspiracy to eliminate him as a competitor of Bair at the beginning of the summer of 1982 and that the last predicate act occurred sometime in the fall of 1982. We find such a short period of time is not sufficient to satisfy the continuity requirement. As the court in *Freshie* explained:

> The continuity requirement is aimed at curtailing use of RICO for charges involving one transaction sliced into a series of acts which occur over a short period of time, are not ongoing, and are not indicative of an open-ended scheme.

*Id.* at 444.

Such is the situation here. In addition, several other factors, such as the existence of a single scheme and a single victim, militate against a finding that defendants' acts constituted a pattern of racketeering activity. In sum, we conclude that defendants' alleged acts were not of the type which RICO sought to proscribe. Accordingly, defendants' motion for summary judgment will be granted on the RICO claim.

### State Law Claims

Finally, defendants argue that should we grant summary judgment with respect to

---

**8.** The Third Circuit on two separate occasions has declined to define the parameters of a pattern of racketeering activity. See *United States v. Grayson,* 795 F.2d 278, 290 (3d Cir.1986) and *Malley-Duff Associates, Inc. v. Crown Life Co.,* 792 F.2d 341, 353 n. 20 (3d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 569, 93 L.Ed.2d 573 (1986). The Middle District of Pennsylvania, however, is split on this issue. Judge Rambo in *Maryland National Bank v. Dauphin Deposit Bank & Trust Co.,* 647 F.Supp. 908 (M.D.Pa. 1986) held that multiple acts in a single fraudulent scheme do not constitute a pattern, while Judge Nealon in *Citizens Savings Association v. Fransciscus,* No. 85–1892 (M.D.Pa. Dec. 30, 1986) rejected this approach.

the federal causes of action we should dismiss the state law claims. Defendants' position has merit and the state law claims will also be dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966).[9]

An appropriate order will be issued.

9. Also outstanding at this time is plaintiff's motion to compel discovery and for sanctions. This dispute was resolved at a pretrial conference held on December 4, 1986 and this motion will be denied as moot.